UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 3:13CR44 (MPS) |
| v. | : | |
| | : | |
| FABIAN AUGUSTINE, a.k.a. "J" and "Fabe" | : | May 22, 2014 |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The Government respectfully submits this Sentencing Memorandum in aid of the sentencing hearing and in response to the sentencing memorandum filed by the defendant Fabian AUGUSTINE, a.k.a. "J" and "Fabe," (the "defendant"), who is currently scheduled for sentencing on May 29, 2014.

### I.      INTRODUCTION AND BACKGROUND

On June 27, 2013, a Federal Grand Jury returned a multi-count superseding indictment charging the defendant and fourteen co-defendants with assorted violations of the Controlled Substances Act and a related offense.   The defendant was charged in Count One, with conspiracy to distribute 280 grams or more of cocaine base, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A).   In addition, the defendant was charged with possession with intent to distribute and distribution of cocaine base and/or heroin in sixteen separate counts (i.e., Counts 27-32, 34-40 and 43-45).

On February 13, 2014, the defendant pled guilty to a lesser included offense of Count One of the Superseding Indictment, to wit, conspiracy to distribute and possess with intent to distribute 28 grams or more of cocaine base, in violation of Title 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(B).   The defendant's guilty plea was entered in accordance with a plea agreement with the Government.   In that agreement, the parties agreed that the defendant's relevant and

1

reasonably foreseeable offense conduct involved at least 112 grams, but less than 196 grams, of cocaine base, which yields a base offense level of 28.   The parties agreed that two levels should be added because he possessed a dangerous weapon, pursuant to U.S.S.G. §§ 2D1.1(b)(1).   The parties also agreed that three levels should be subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, which results in an adjusted offense level of 27.   The parties further agreed that the defendant does <u>not</u> qualify for the two-level safety valve reduction under U.S.S.G. §§ 5C1.2 and 2D1.1(b)(16) because he possessed a firearm in connection with this offense.   An adjusted offense level of 27 and a Criminal History Category I results in a Guideline range of 70 to 87 months of imprisonment and a fine range of $12,500 to $5,000,000.

The defendant agreed not to appeal or collaterally attack his conviction or sentence if his sentence does not exceed 87 months of imprisonment, 4 years of supervised release, a $12,500 fine and a $100 special assessment.   The Government further agreed that after the defendant's sentencing, the Government will move to dismiss the remaining counts of the superseding indictment as to the defendant.[1]

## II.    FACTS AND CIRCUMSTANCES OF DEFENDANT'S CONDUCT

In March of 2013, the ATF Hartford Field Office initiated an investigation into the criminal activities of Luther NANCE, a.k.a. "Papers" and "Cash," and his narcotics trafficking associates, which include the following: Fabian AUGUSTINE, a.k.a. "Fabe"; Anthony HARRINGTON, a.k.a. "Tone"; Antoine ARMOUR, a.k.a. "Slim"; Alonzo HAMILTON, a.k.a. "Al"; James BROWN, a.k.a. "Decky," and others.   The DEA Hartford Resident Office subsequently became

---

[1]      The plea agreement states that "[a]fter sentencing, the Government will move to dismiss Count 27, Count 28, Count 29, Count 30, Count 31, Count 32, Count 34, Count 35, Count 36, Count 37, Count 38, Count 39, Count 40, Count 43, Count 44 and Count 45 of the Superseding Indictment as they pertain to the defendant."

involved in this investigation.   The investigation revealed that NANCE and his associates were operating a large-scale narcotics trafficking operation in several communities throughout Connecticut, including Hartford, East Hartford, Manchester, Willimantic, Norwich and Middletown.

Investigators developed information from multiple cooperating sources that Fabian AUGUSTINE was a member of James "Decky" BROWN's crew, which distributed narcotics, unlawfully possessed and used firearms, and allegedly engaged in crimes of violence.   Multiple cooperating sources advised that AUGUSTINE and his close associates, which included James "Decky" BROWN, Antoine ARMOUR, Alonzo HAMILTON and Allen COX, distributed narcotics in Hartford and surrounding areas.   AUGUSTINE primarily distributed narcotics from BROWN's residence at 57 Carroll Road in East Hartford, CT and the Sheldon Oaks apartments in Hartford, CT.   The information regarding AUGUSTINE was corroborated by, *inter alia*, controlled purchases of narcotics, consensually recorded telephone calls, recorded meetings, physical surveillance, electronic surveillance, judicially authorized interceptions telephone calls and text messages, admissions made by co-conspirators and other evidence.

### A.   Controlled Purchases of Narcotics from AUGUSTINE.

Between August 15, 2012 and December 23, 2012, cooperating witnesses ("CWs") who were working with law enforcement agents made twelve (12) controlled purchases of crack cocaine and heroin from AUGUSTINE.   All of the controlled purchases were visually surveilled by law enforcement agents and were recorded by audio and/or video recording devices.   The CWs were searched before and after the controlled purchases, and were kept under visual surveillance throughout the controlled transactions.   After each controlled purchase, the CWs were debriefed regarding the controlled purchase and the accounts provided by the CWs were determined to be

consistent with the electronic surveillance.   In addition, the narcotics acquired during the controlled purchases were tested at the DEA laboratory, which confirmed the chemical composition of the narcotics substances.   Specifically, the twelve controlled purchases of crack cocaine and heroin from AUGUSTINE were as follows:

- On August 15, 2012, a CW made a controlled purchase of "two bundles" (20 bags) of heroin from AUGUSTINE in exchange for $100.

- On August 24, 2012, a CW purchased thirty (30) bags of heroin from AUGUSTINE for $140.   After the sale, AUGUSTINE left with co-defendant Morgan GILL and an unidentified third person.

- On August 30, 2012, a CW purchased one hundred (100) bags of heroin from AUGUSTINE for $460.

- On September 10, 2012, a CW purchased one hundred (100) bags of heroin from AUGUSTINE for $460.   During this sale, AUGUSTINE was with Allen COX, a.k.a. "Scrape."

- On September 19, 2012, two CWs purchased approximately 1.4 grams of crack cocaine for $160 and ninety-nine (99) bags of heroin for $460 from AUGUSTINE. During this sale, AUGUSTINE was with Allen COX, a.k.a. "Scrape."

- On September 26, 2012, a CW purchased approximately 7.3 grams of crack cocaine for $300 from AUGUSTINE and co-defendant Alonzo HAMILTON.

- On October 10, 2012, two CWs purchased approximately 14 grams of crack cocaine for $540 and one hundred (100) bags of heroin for $470 from AUGUSTINE.

- On October 16, 2012, a CW purchased one hundred (100) bags of heroin for $460 from AUGUSTINE and approximately 23.3 grams of crack cocaine for $600 from AUGUSTINE and co-defendant Montrell HUFF.

- On November 1, 2012, a CW purchased one hundred (100) bags of heroin for $460 from AUGUSTINE.   In addition, the CW purchased approximately 14 grams of cocaine base for $600 from co-defendants Fabian AUGUSTINE and Anthony HARRINGTON.   Physical surveillance, intercepted calls and other evidence revealed that they obtained the crack cocaine from co-defendant Jahmell HARDING.

- On November 9, 2012, a CW purchased one hundred (100) bags of heroin for $460 from AUGUSTINE.   In addition, the CW purchased approximately 30 grams of cocaine base from co-defendants Fabian AUGUSTINE, Anthony HARRINGTON and Jahmell HARDING in exchange for $1,140.

- On December 16, 2012, a CW purchased one hundred (100) bags of heroin for $460 from AUGUSTINE.   In addition, the CW purchased approximately 29.4 grams of cocaine base from co-defendants Fabian AUGUSTINE, Anthony HARRINGTON and Michael GLENN in exchange for $1,200.   Prior to this controlled purchase, investigators intercepted AUGUSTINE over HARRINGTON's telephone asking HARRINGTON what the price was for "six treys," i.e., 63 gram quantities of crack cocaine.

- On December 23, 2012, a CW purchased approximately 29.9 grams of cocaine base from co-defendants Fabian AUGUSTINE, Anthony HARRINGTON and Michael GLENN in exchange for $1,200.

**B.    Wire and Text Interceptions over ARMOUR's, AUGUSTINE's and HARRINGTON's Cell Phones.**

On October 4, 2012, Senior United States District Judge Alfred V. Covello signed an order authorizing the interception of wire and electronic communications over a cellular telephone ("Target Telephone 1") used by co-defendant Antoine ARMOUR to conduct his narcotics trafficking activities.   Investigators intercepted calls over Target Telephone 1 for approximately six days until October 9, 2012, when ARMOUR and co-defendant Alonzo HAMILTON were arrested on state charges. During the six days that investigators intercepted calls over Target Telephone 1, the intercepted calls revealed that ARMOUR, HAMILTON, AUGUSTINE, COX and others were working together to distribute crack cocaine, heroin and marijuana.   Investigators intercepted multiple calls during which ARMOUR called AUGUSTINE to obtain heroin and crack cocaine.   Intercepted calls, physical surveillance and other evidence revealed that ARMOUR, AUGUSTINE, HAMILTON and COX were regularly distributing narcotics from the parking lot of the Sheldon Oaks Apartment complex in Hartford, CT and also traveling to other

5

locations in Hartford, East Hartford and Manchester to distribute narcotics.   Additionally, these individuals were in regular contact with co-defendants BROWN and GILL regarding their narcotics distribution efforts.

On November 5, 2012, Judge Covello signed an order authorizing the interception of wire and electronic communications occurring over AUGUSTINE's telephone ("Target Telephone 2"). Investigators intercepted calls over Target Telephone 2 for approximately eight days until November 12, 2012, when AUGUSTINE was incarcerated for non-payment of child support. Interceptions over Target Telephone 2 revealed, *inter alia*, the following: AUGUSTINE was distributing crack cocaine, heroin and marijuana; AUGUSTINE used Target Telephone 2 to conduct and arrange his narcotics trafficking activities; AUGUSTINE appeared to be working with BROWN, GILL and COX to sell narcotics; AUGUSTINE obtained crack from HARRINGTON and GILL; AUGUSTINE obtained heroin from a separate unidentified source; and most of AUGUSTINE's drug transactions were conducted in and around Sheldon Oaks.

From on or about November 12, 2012 through December 12, 2012, AUGUSTINE was held in state custody for non-payment of child support.   On December 12, 2012, United States District Judge Robert N. Chatigny signed an order authorizing the interception of wire and electronic communications occurring over HARRINGTON's telephone ("Target Telephone 3").[2] Between December 13, 2012 and December 19, 2012, investigators intercepted numerous calls between AUGUSTINE and HARRINGTON during which they appeared to be discussing and arranging narcotics trafficking activities.   Based on the intercepted calls, it appeared that

---

2       Between December 13, 2012 and January 10, 2014, investigators intercepted calls over Target Telephone 3.   On December 13, 2012, HARRINGTON activated a new cellular telephone ("Target Telephone 4") and his use of Target Telephone 3 steadily declined.   Within approximately 7-10 days, HARRINGTON had transitioned substantially most of his communications with his narcotics trafficking associates to Target Telephone 4.

AUGUSTINE was continuing to obtain crack cocaine from HARRINGTON.   After December 19, 2012, it appeared, based on toll records, that AUGUSTINE communicated with HARRINGTON over HARRINGTON's new cellular telephone (i.e., Target Telephone 4).   On January 10, 2013, AUGUSTINE and BROWN were arrested by the Glastonbury Police Department on state drug charges.   AUGUSTINE has remained in custody since his January 10, 2013 arrest.

### C.   **AUGUSTINE Arranged For His Crew to Rob a Stash Location.**

On October 10, 2012, when AUGUSTINE sold a half ounce of crack cocaine and a "stack" of heroin, the CW asked the defendant if he had access to a gun for sale.   The defendant told the CW that if he has a problem that the defendant and his crew could handle any issues on his behalf. The defendant also told the CW that he and his crew had robbed drug dealers for profit or as an act of revenge if the CW was ever in need of such assistance.   The defendant said that he and his crew could arrange for another robbery if the CW had information.   The defendant told the CW that "Cuz I mean my niggas, we definitely run up in there.   I mean do what we gotta do man, rob niggas and see what's goody . . . That's what we really want to do.   So, I mean, I ain't gonna lie, if it's worth it, and them niggas getting' it and you know they got work (drugs) and you know they got bread (money) and you know what's poppin' and we map it out, we talk, we can get this poppin up here."

On October 16, 2012, AUGUSTINE called the CW and told him that he had someone who was looking to sell a Smith and Wesson .380 handgun that was "new in the box."   AUGUSTINE said that the individual would sell the firearm for $750.   The CW told AUGUSTINE that the price was too high, but would work with the seller if the price was lower.

On November 1, 2012, AUGUSTINE sold a half ounce of crack cocaine and a "stack" of

heroin to the CW.   During the deal, the CW told the defendant that the CW's "man" may have a

drug stash house to rob and asked the defendant if he was still interested.   When the defendant

replied that he was still interested, the CW asked the defendant how many people he had to commit

the robbery.   The defendant replied, "Four of us, man.   We do the, do the, we got the job done.

Shit, you got a driver and three niggas if that's the case."   Later in the conversation, the defendant

added, "I ain't gonna lie.   Let me put it to you like this. . . I mean, we got, we gonna have, we'll

have a gun on everybody in that car.   Mother fuckin', um, but them shits right there, nobody

selling them shits."   The defendant said that "niggas got problems with niggas," so no one is

selling their guns.   When the CW interrupted that nobody wants to sell their guns if that is the

case, the defendant responded,

> Especially one of my mans, one of the main niggas, the one who got most of
> all the . . . the main niggas that got the, um, the guns and shit, that mostly got
> all the guns like.   This nigga been shot and shit before.   Nigga in a
> wheelchair (i.e., co-defendant James "Decky" BROWN) and shit.   And
> that nigga just crazy.   He don't give a fuck.   So he just gonna shoot
> whatever and he always got to have a gun.   But I mean, you know, with us
> being his niggas, everyone's got to have a gun.   Personally, me, I got my
> own shit.   I don't need nobody's shit.   I mean, I've been trying to run into
> some…I had another one.   My little brother ended up going down with that
> shit.   I could have sold you that shit.

Much of what AUGUSTINE said has been corroborated by other evidence.   For example,

multiple cooperating sources have provided information regarding a stash of firearms that were

held by BROWN and available to or used by BROWN's crew.   As stated by AUGUSTINE,

BROWN has been shot before and is in a wheelchair.   In addition, BROWN is alleged to have

been involved in multiple shootings.   Further, as AUGUSTINE indicated, his little brother was

arrested and convicted for unlawfully carrying a firearm -- which, based on AUGUSTINE's

recorded statements to the CW, belonged to AUGUSTINE.   See PSR ¶ 38.

On or about November 12, 2012, the defendant was arrested pursuant to a civil commitment for non-payment of child support.   The defendant was released from state custody on December 12, 2012.

On December 16, 2012, the CW re-established contact with the defendant and made a controlled purchase of an ounce of crack cocaine and a stack of heroin.   The CW asked whether the defendant was still interested in robbing a drug stash house and showed him a picture on his cellular telephone[3] of several kilograms of cocaine in the trunk of a vehicle.   The CW told the defendant that his associate had access to this quantity of narcotics each month and this is what they would be robbing if the defendant could get a crew together.   The defendant expressed a continued willingness to conduct the robbery.

On December 17, 2012, an anonymous citizen reported to the East Hartford Police Department ("EHPD") that he/she observed a grey Infiniti (which belongs to co-defendant Alonzo HAMILTON) occupied by three black males all wearing all black with hoods.   The citizen told the EHPD that the three males began walking towards Walgreens on Connecticut Boulevard in East Hartford, CT.   While walking towards the Walgreens, the citizen heard the males say, "Come on, let's do this, hurry."   At this point, the citizen called the police and a short while later, the three black males ran back to their car.   The Infiniti left the Walgreens parking lot with its headlights off.   An EHPD office located the vehicle parked at 57 Carroll Road in East Hartford, CT (i.e., co-defendant James "Decky" BROWN's residence).   As the grey Infiniti drove away from 57 Carroll Road, an EHPD officer conducted a motor vehicle stop.   During the stop, the officer smelled a strong odor of marijuana.   The officer identified the owner and operator of the

---

3       The picture had been provided by law enforcement.   In fact, no actual drug stash house existed and the CW was coordinating the "planned robbery" closely with ATF.

Infiniti as co-defendant Alonzo HAMILTON and the passengers as AUGUSTINE and co-defendant Allen COX.

On December 23, 2012, AUGUSTINE sold approximately 29.9 grams of crack cocaine to the CW.   During the controlled purchase, the CW advised the defendant that his "man" was away for the holidays but wanted to meet with the defendant to discuss the home invasion/robbery scenario.   The CW said that his associate would have more details on the target of the home invasion and would be around after the New Year.   The defendant advised that he would be around.

On January 3, 2013, the CW introduced the defendant to an ATF Undercover Agent ("UC").   The UC represented himself to be a disgruntled drug-runner who regularly picks up several kilograms of cocaine from a guarded stash house.   The defendant arrived at this meeting in James "Decky" BROWN's silver Infiniti.   BROWN, who was driving the car, waited in the car while AUGUSTINE met with the CW and the UC.   During the meeting, the UC said that he wanted to make sure that the defendant was serious about the home invasion/robbery and that the crew doing the robbery was experienced because there were individuals armed with guns guarding the narcotics location.   The defendant told the UC and CW that he was excited about the robbery. During the meeting, AUGUSTINE said "I got one of them toys" and removed a firearm from his waistband area and told the CW it was a "P-22."   AUGUSTINE said, "I'm about to go drop these shits off to the house.   We over here rolling around with this, I'm all [UI]."   The UC asked if the firearm was a .40 or 9mm caliber firearm, at which point, AUGUSTINE responded that it was "P-22" and removed the firearm from his waistband area again.   AUGUSTINE displayed the firearm to the CW and the UC.   The UC recognized that the firearm was in fact a Walther P-22. AUGUSTINE indicated that the P-22 belonged to BROWN, stating "this (i.e., the P-22) that nigga

10

(BROWN) that that that got all them shits.   He got all them [UI]."   AUGUSTINE also

mentioned that he has a second firearm in his vehicle.   When the UC stressed that he didn't want

amateurs to do the job and that the people who guard the stash location will shoot, AUGUSTINE

said, "I mean, my niggas definitely will shoot too, man.   That's what they do.   That's what they

do."   AUGUSTINE said that he and his associates have plenty of guns to handle the job.

On January 10, 2013, the defendant had made arrangements to meet with the UC and

introduce the UC to other associates who would take part in the planned robbery of a stash house.

However, before the meeting could take place, the defendant was arrested by the Glastonbury

Police Department on state drug charges.

### D.  AUGUSTINE's State Arrest.

In December 2012, a state narcotics task force received information regarding a crack

cocaine dealer (later identified as co-defendant James BROWN) who was selling narcotics in the

Glastonbury area.   On December 27, 2012 and January 3, 2013, an undercover police officer (the

"UC") conducted two controlled purchases of crack cocaine from BROWN in Glastonbury.   On

January 10, 2013, the UC arranged to purchase crack cocaine and heroin from BROWN in the

Home Depot parking lot in Glastonbury.   During the early evening hours of January 10, 2013,

members of a state narcotics task force observed BROWN's silver Infiniti to the Home Depot

parking lot at the arranged time.   (BROWN had used the Infiniti during the controlled sales on

December 27, 2012 and January 3, 2013.)   On this occasion, AUGUSTINE was driving the silver

Infiniti and BROWN was in the front passenger seat.   State task force officers approached the car

and detained BROWN and AUGUSTINE.   Both AUGUSTINE and BROWN said they were just

driving around and both denied coming to Glastonbury to sell drugs.   A search of BROWN, who

is a paraplegic, was negative for contraband.   Investigators searched AUGUSTINE and seized

three "bundles" (30 bags) of heroin stamped "Polo."   Investigators then searched BROWN's car and seized 55 bags of heroin stamped "Polo," five cell phones, $291 and a dime bag of marijuana. AUGUSTINE and BROWN were arrested on state narcotics charges.

****

In sum, the evidence establishes that the defendant Fabian AUGUSTINE conspired with numerous individuals, including Anthony HARRINGTON, Antoine ARMOUR, Alonzo HAMILTON, James BROWN, Morgan GILL, Allen COX, Michael GLENN and Jahmell HARDING, to possess with intent to distribute and to distribute cocaine base.   In addition, the evidence establishes that the defendant's relevant and reasonably foreseeable offense conduct involved more than 112 grams, but less than 196 grams, of cocaine base.

III.   **THE DEFENDANT'S GUIDELINE RANGE**

The government agrees with the Guideline calculation set forth in the PSR. Specifically, the defendant's relevant and reasonably foreseeable offense conduct involved at least 112 grams, but less than 196 grams, of cocaine base, which yields a base offense level of 28.   See PSR ¶ 18.   Two levels should be added because he possessed a dangerous weapon, pursuant to U.S.S.G. §§ 2D1.1(b)(1).   See PSR ¶ 19.   After a three level reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility, the defendant's adjusted offense level is 27.   See PSR ¶ 27.   An adjusted offense level of 27 and a Criminal History Category I results in a Guideline range of 70 to 87 months of imprisonment, a fine range of $12,500 to $5,000,000 and a supervised release term of 4 years to life.

However, consistent with the recent proposed amendments to the Sentencing Guidelines, the Government would agree to a 2-level downward variance to this Guideline range.   A 2-level downward variance would place the defendant at a total offense level of 25.   A total offense level

of 25, again assuming a Criminal History Category I, would result in a Guideline imprisonment range of 60 to 71 months' imprisonment, a Guideline fine range of $10,000-$5,000,000 (U.S.S.G. § 5E1.2(c)(4)) and a supervised release term of 4 years to life.

## IV.   A SENTENCE AT THE HIGH END OF THE DEFENDANT'S GUIDELINE IMPRISONMENT RANGE IS APPROPRIATE

The Government respectfully submits that the Court should impose a sentence at the high end of the defendant's guideline range -- which is 60-71 months' imprisonment -- for several principal reasons.   First, such a sentence should be imposed to reflect the seriousness of the criminal activities committed by the defendant.   On a daily basis, AUGUSTINE and his crew of close associates were selling for profit crack cocaine and heroin in Hartford and surrounding areas. On *twelve* occasions between August 15, 2012 and December 23, 2012, investigators conducted controlled purchases of crack cocaine and heroin from AUGUSTINE.   On multiple occasions, AUGUSTINE was with his close associates when he sold crack cocaine and heroin to the CWs. During the six days in October 2012 that investigators intercepted calls over ARMOUR's phone, investigators intercepted numerous calls between ARMOUR and AUGUSTINE during which they discussed and arranged narcotics deals.   During the eight day period prior to AUGUSTINE's arrest on or about November 12, 2012, investigators intercepted calls over a cellular telephone used by AUGUSTINE to conduct his narcotics trafficking activities.   The intercepted calls revealed, *inter alia*, that: AUGUSTINE appeared to be working with BROWN, GILL, COX, HARRINGTON and others to sell narcotics; AUGUSTINE obtained crack from HARRINGTON and GILL; AUGUSTINE obtained heroin from a separate unidentified source; and AUGUSTINE primarily sold drugs in and around Sheldon Oaks.   This is serious criminal activity.   Drugs like

crack cocaine and heroin have destroyed the lives of far too many citizens and families in Connecticut.

In addition, during recorded conversations, AUGUSTINE admitted that he possessed firearms.   On November 1, 2012, AUGUSTINE said during a recorded conversation that he and his crew all have guns and that AUGUSTINE has his own gun.   AUGUSTINE said he used to have another gun too, but "my little brother ended up going down with that shit."   During a recorded meeting with a CW and a UC on January 3, 2013, AUGUSTINE removed a firearm from his waistband area and showed it to the CW and the UC.   AUGUSTINE confirmed that the firearm was a Walther P-22.   AUGUSTINE indicated that the Walther P-22 belonged to BROWN, but AUGUSTINE had his own firearm in his car.   Far too often, the intersection of drug trafficking and firearms result in tragic consequences.   When drug traffickers possess and use firearms as a tool of their trade, deadly violence can – and far too often does – result.

Moreover, as stated in the PSR, it "is apparent from recorded conversations, [AUGUSTINE] was ready, willing and able to carry out armed robberies of fellow drug dealers." PSR ¶ 70.   During multiple recorded meetings, AUGUSTINE met with a CW and/or a UC to discuss and arrange AUGUSTINE and his crew robbing a narcotics stash location.   During a recorded conversation on November 1, 2012, AUGUSTINE said that AUGUSTINE and three associates would do the robbery and "we'll have a gun on everybody in the car."   AUGUSTINE further said that BROWN has most of the guns "and that nigga just crazy.   He don't give a fuck. So he just gonna shoot whatever and he always got to have a gun.   But I mean, you know, with us being his niggas, everyone's got to have a gun."   During a recorded meeting on January 3, 2013, the UC told AUGUSTINE that he didn't want amateurs doing the robbery because the people who guard the stash location will shoot.   In response, AUGUSTINE said, "I mean, my niggas

definitely will shoot too, man.   That's what they do.   That's what they do."   AUGUSTINE also said that he and his associates have plenty of guns to handle the job.   This is extremely serious and disturbing conduct.

The defendant argues in his sentencing memorandum that prior to his arrest in this case, he was attempting to change his ways.   See Def. Mem. at 2.   While the defendant may have "taken steps to enroll in college to pursue a trade or skill" (id.), there is no indication that AUGUSTINE had taken any steps to disassociate himself from or withdraw from his criminal activities.   As discussed above, on a daily basis, the defendant and his associates were selling for profit crack cocaine and heroin in Hartford and surrounding areas until the defendant's arrest on or about November 12, 2012.   The defendant was held in state custody until on or about December 12, 2012 as a result of non-payment of child support.   The day after AUGUSTINE was released from custody, he was intercepted over HARRINGTON's phone asking the price for "six treys" (63 gram quantities) of crack cocaine.   Over the next seven days (i.e., December 13-19, 2012), investigators intercepted numerous calls between AUGUSTINE and HARRINGTON during which the discussed and arranged narcotics trafficking activities.   (Toll records reveal that after December 19, 2012, AUGUSTINE was communicating with HARRINGTON over HARRINGTON's new cell phone, which was not the subject of Title III intercepts at that time).   Three days later, on December 16, 2012, AUGUSTINE sold "stack" of heroin and an ounce of crack cocaine to a CW.   A week later, on December 23, 2012, AUGUSTINE sold another ounce of crack cocaine to a CW.   In addition, AUGUSTINE had multiple recorded conversations in December 2012 and January 2013 with the CW and/or UC regarding AUGUSTINE and his crew robbing a stash location.   As discussed above, during the January 3, 2013 recorded meeting, AUGUSTINE was carrying a Walther P-22 firearm in his waiste-band (which AUGUSTINE

15

displayed to the CW and UC twice) and AUGUSTINE assured the UC that AUGUSTINE's crew was experienced, had shooters and had sufficient guns to handle the job.   A week later, on the day that AUGUSTINE was scheduled to meet with the UC to discuss and arrange the planned robbery, AUGUSTINE and BROWN were arrested by a state narcotics task force.   On that day (i.e., January 10, 2013), state investigators seized three "bundles" (30 bags) of heroin from AUGUSTINE's person and another 55 bags of heroin, five cell phones, $291 and a "dime bag" of marijuana from BROWN's and AUGUSTINE's car.   These are not the actions of someone who is attempting to change his ways and disassociate himself from criminal activity.

In sum, a sentence to a significant term of imprisonment is necessary to reflect the seriousness of the defendant's criminal activities, as well as to promote respect for the law and to provide just punishment for the offense.   See 18 U.S.C. § 3553(a)(2)(A).

Second, a sentence of imprisonment at the high end of the defendant's guideline range would appropriately protect the public from the defendant, see 18 U.S.C. § 3553(a)(2)(C), and provide adequate deterrence to future criminal conduct of the defendant and others.   See 18 U.S.C. § 3553(a)(2)(B).   A definitive and clear message must be sent that the Court will not tolerate regularly selling crack cocaine and heroin for profit, let alone possessing firearms in connection with narcotics trafficking activities and arranging armed robberies of other drug dealers.   A sentence of imprisonment at the high end of the defendant's guideline range would send an appropriate and necessary message not only to the defendant, but also to others in the community, that this activity will not be tolerated by this Court.

**V.**     **CONCLUSION**

For the foregoing reasons, the Government submits that a sentence at the high end of the

defendant's guidelines range is reasonable, appropriate and not greater than necessary to achieve

the purposes of sentencing under 18 U.S.C. §3553(a).

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

*/s/ Geoffrey M. Stone*

GEOFFREY M. STONE
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. CT 25326

CERTIFICATE OF SERVICE

This is to certify that on May 22, 2014, a copy of the foregoing Sentencing Memorandum
was filed electronically and served by mail on anyone unable to accept electronic filing.   Notice
of this filing will be sent by email to all parties by operation of the Court's electronic filing system
or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic
Filing.   Parties may access this filing through the Court's CM/ECF System.

*/s/ Geoffrey M. Stone*

GEOFFREY M. STONE
ASSISTANT UNITED STATES ATTORNEY