UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 3:13CR44 (MPS) |
| v. | : | |
| | : | |
| ANTHONY HARRINGTON, a.k.a. "Tone" | : | July 8, 2014 |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The Government respectfully submits this Sentencing Memorandum in response to the defendant's sentencing memorandum dated July 8, 2014 and in aid of the sentencing hearing of the defendant Anthony HARRINGTON, a.k.a. "Tone" (the "defendant"), who is currently scheduled for sentencing on July 15, 2014.

## I.    INTRODUCTION AND BACKGROUND

On June 27, 2013, a Federal Grand Jury returned a multi-count superseding indictment charging the defendant and fourteen co-defendants with assorted violations of the Controlled Substances Act and a related offense.   The defendant was charged in Count One, with conspiracy to distribute 280 grams or more of cocaine base, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A).   In addition, the defendant was charged with possession with intent to distribute and distribution of cocaine base in five separate counts (i.e., Counts 37, 39, 41, 43 and 45).

On March 27, 2014, the defendant pled guilty to Count One of the Superseding Indictment, to wit, conspiracy to distribute and possess with intent to distribute 28 grams or more of cocaine base, in violation of Title 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(B).   The defendant's guilty plea was entered in accordance with a plea agreement with the Government.   In that agreement, the parties agreed that the defendant's relevant and reasonably foreseeable offense conduct involved at least 112 grams, but less than 196 grams, of cocaine base, which yields a base offense

1

level of 28.   The parties agreed that three levels should be subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, which results in an adjusted offense level of 25.   An adjusted offense level of 25 and a Criminal History Category IV would result in a Guideline range of 84 to 105 months of imprisonment and a fine range of $10,000 to $5,000,000.

The parties further agreed that the United States Sentencing Commission has proposed an amendment to the Sentencing Guidelines that would generally lower the base offense levels in the Drug Quantity Table in Guideline § 2D1.1 (the "proposed amendment").   It is anticipated that the proposed amendment, if approved, would take effect on November 1, 2014.   If the proposed amendment is approved in its current form, the parties agree that the defendant's relevant and readily foreseeable conduct of at least 112 grams, but less than 196 grams, of cocaine base would result in a base offense level of 26 under U.S.S.G. § 2D1.1.   After a three level reduction for acceptance of responsibility, a total offense level 23 and a Criminal History Category IV would result in a Guideline imprisonment range of 70 to 87 months and a fine range of $10,000 to $5,000,000.

In light of the proposed amendment, the Government agreed not to object to a downward variance to give effect to the proposed amendment.   Regardless of the Guidelines range ultimately determined by the Court, the Government and the defendant both reserved their rights to seek a departure or a non-Guidelines sentence, and both sides reserved their rights to object to a departure or a non-Guidelines sentence, except that, as set forth above, the Government agreed to not object to a downward variance to give effect to the proposed amendment.

The defendant agreed not to appeal or collaterally attack his conviction or sentence if his sentence does not exceed 105 months of imprisonment, 4 years of supervised release, a $10,000 fine and a $100 special assessment.   The Government further agreed that after the defendant's

sentencing, the Government will move to dismiss the remaining counts of the superseding indictment (specifically, Counts 37, 39, 41, 43 and 45) as to the defendant.

## II.    FACTS AND CIRCUMSTANCES OF DEFENDANT'S CONDUCT

In March of 2012, the ATF Hartford Field Office initiated an investigation into the criminal activities of Luther NANCE, a.k.a. "Papers" and "Cash," and his narcotics trafficking associates, which include among others: Anthony HARRINGTON, a.k.a. "Tone"; Fabian AUGUSTINE, a.k.a. "Fabe"; Antoine ARMOUR; Alonzo HAMILTON, a.k.a. "Al"; Morgan GILL; and others. The DEA Hartford Resident Office subsequently became involved in this investigation.   The investigation revealed, *inter alia*, the following regarding HARRINGTON: on a regular basis, HARRINGTON sold crack cocaine for profit; HARRINGTON obtained crack cocaine from Michael GLENN, Jahmell HARDING, Luther NANCE, Morgan GILL and other sources of supply; HARRINGTON supplied Fabian AUGUSTINE, Alonzo HAMILTON and other drug dealers with crack cocaine; HARRINGTON sold crack to customers in Hartford, CT and Providence, RI; and HARRINGTON used his cellular telephone to facilitate and arrange narcotics transactions.

### A.    Controlled Purchases of Narcotics from HARRINGTON, AUGUSTINE and/or HAMILTON.

During the Fall of 2012, investigators used cooperating witnesses to make multiple controlled purchases from AUGUSTINE and HAMILTON, among others.   On at least five occasions between November and December 2012, HARRINGTON supplied the crack that AUGUSTINE and HAMILTON sold to the cooperating witnesses.   Indeed, HARRINGTON was present at each of these five controlled purchases and, in four instances, directly participated in the sale of crack cocaine to the cooperating witnesses.

3

1.     **Controlled purchase of 14 grams of crack on 11/1/12.**

On November 01, 2012, under the direction of investigators, a cooperating witness (the "CW") had several recorded calls with AUGUSTINE to arrange to purchase from AUGUSTINE a "stack" (100 bags) of heroin and a "half ounce" (14 grams) of crack cocaine.   During the calls, AUGUSTINE told the CW that he would contact his source of supply to confirm the transaction. The CW, under the direction of the ATF, traveled to the Sheldon Oaks apartment complex in Hartford, CT and parked in the Sheldon Oaks parking lot.   Several minutes later AUGUSTINE approached the CW's vehicle on foot and entered the front passenger seat.   Upon entering the vehicle, AUGUSTINE received a telephone call.   AUGUSTINE then stated to the CW that his source of supply for the crack cocaine (i.e., HARRINGTON) was telling AUGUSTINE he would be there in ten minutes because he didn't have a vehicle.   AUGUSTINE then asked the CW if he wanted to travel to get the crack cocaine and the CW stated that he did not.   While waiting for AUGUSTINE's crack source (HARRINGTON), AUGUSTINE sold one hundred bags of heroin to the CW.

Approximately twenty-five minutes later, AUGUSTINE exited the front passenger seat of the CW's vehicle and approached HARRINGTON, who had walked into the lot from the south side of the Sheldon Oaks apartments.   AUGUSTINE then returned to the CW's vehicle and stated that the source of supply for the crack cocaine had arrived, referring to HARRINGTON.   At the same time, HARRINGTON approached and entered the front passenger seat of a BMW bearing Connecticut registration 622-YPT, registered to Jahmell HARDING of 157 Henry Street in Windsor, CT, that had just entered the parking lot. The CW then provided AUGUSTINE with $600 in ATF Agent cashier funds.   AUGUSTINE then walked toward the Sheldon Oaks apartments.   At that time, HARRINGTON exited the front passenger seat of the BMW,

4

approached the CW's vehicle and opened the passenger side door.   Upon doing so, HARRINGTON immediately closed the door and walked over to meet with AUGUSTINE.   After meeting briefly with AUGUSTINE, HARRINGTON returned to the BMW and AUGUSTINE returned to the front seat of the CW's vehicle.   Upon entering the CW's vehicle, AUGUSTINE provided the CW with four "eight balls" or a half ounce of suspected crack cocaine. AUGUSTINE and the CW engaged in a brief conversation about the weight of the crack cocaine being good and then AUGUSTINE exited the vehicle.   The suspected crack cocaine had a total weight including packaging material of 14.0 grams.

### 2.      Controlled purchase of 30 grams of crack on 11/9/12.

On November 8, 2012, under the direction of investigators, a CW called AUGUSTINE to purchase an ounce of crack cocaine.   This call and subsequent calls were intercepted over AUGUSTINE's cell phone, referenced as "Target Telephone 2."   During the call, the CW said, "Yo, man. Im going to need that O. I'm going to need that whole thing."   AUGUSTINE asked, "You need the whole thing?" and the CW replied, "Yeah the whole thing from 'em." AUGUSTINE then said he would call his crack source.

On November 9, 2012, at approximately 1216 hours, AUGUSTINE, utilizing Target Telephone 2, was intercepted placing a phone call to (860) 794-5233 (referenced as "Target Telephone 3") and speaking to HARRINGTON.   During the call AUGUSTINE asked HARRINGTON for "whole thing…a whole O," in reference to an ounce of crack cocaine.   At approximately 1232 hours, HARRINGTON called AUGUSTINE back and said that he would have the crack.

On that same date, at approximately 1757 hours, the CW, under the direction of the ATF, traveled the Sheldon Oaks apartments and parked in the area in front of 159 Sheldon Street.   A

few moments later AUGUSTINE entered the front passenger seat of the CW's vehicle.   Once AUGUSTINE entered the vehicle, the CW engaged him in a conversation about the source of supply for the crack cocaine, referring to HARRINGTON.   AUGUSTINE explained that the source didn't want to come to the projects, but was amenable to meeting them around the corner. AUGUSTINE then got out of the CW's car, walked to 159-D Sheldon Street and then returned to the CW's car while talking on the phone.   Investigators intercepted AUGUSTINE talking to HARRINGTON, who said he was almost at the meeting location (i.e., the Sports Park retail store) and AUGUSTINE said he would go over there now.   AUGUSTINE entered the CW's car and sold him a stack of heroin.   After conducting the heroin transaction, AUGUSTINE directed the CW to drive around the corner to Main Street in Hartford.   At approximately 1813 hours, the CW, at AUGUSTINE'S direction, parked in the area of the Sports Park retail store, located at 250 Main Street in Hartford, Connecticut.   At 1815 hours, AUGUSTINE received a phone call from HARRINGTON who was using another phone.   During this call, HARRINGTON said he was in a Toyota Camry parked near the CW's car.   HARRINGTON told AUGUSTINE that his phone ran out of battery and he was using a cell phone belonging to the person in the Toyota Camry. AUGUSTINE told HARRINGTON to come to the CW's vehicle, a Lexus sedan.

Immediately after ending the call with AUGUSTINE, surveillance units observed HARRINGTON exit from a Toyota Camry believed to be operated by a certain co-conspirator that had parked on Main Street a few car lengths north of the CW's vehicle.   HARRINGTON entered the CW's vehicle and explained that his "people" in the Toyota Camry were nervous about meeting the CW.   HARRINGTON and AUGUSTINE then exited the CWs vehicle, met with the occupant of the Camry and then returned to the CW's vehicle with an "eight ball" of crack cocaine. They told CW that the occupant of the Camry had seven additional "eight balls" if the CW liked

6

that one.   The CW weighed the "eight ball" and decided it did not weigh enough and refused to conduct the transaction.

At approximately 1821 hours, HARRINGTON, utilizing Target Telephone 2, placed a call to Jahmell HARDING.   During the call, HARRINGTON said he needed eight 8-balls of crack cocaine for the CW and another four 8-balls for HARRINGTON for a separate transaction.   When HARDING says that he does not want to be driving around with that quantity of narcotics and agrees to bring HARRINGTON the ounce of crack cocaine for the CW and that he would then bring HARRINGTON the additional half ounce later.   After this call, HARRINGTON returned the "eight ball" of crack to the individual in the Camry and then returned to the CW's vehicle. The Camry then exited the area.   AUGUSTINE then asked HARRINGTON where the source in the Camry was from and HARRINGTON replied "Blue Hills," referring to Blue Hills Avenue in Hartford, CT.   HARRINGTON then said that his crack source (HARDING) would be there in a few minutes.

At approximately 1828 hours, HARRINGTON and AUGUSTINE exited the CW's vehicle and entered the Sports Park retail store.   The two returned to the CW's vehicle at approximately 1839 hours. Upon entering the vehicle, AUGUSTINE and HARRINGTON told the CW that the second source of supply for the crack cocaine, HARDING, was located around the corner by the liquor store.   As such, the CW, with AUGUSTINE and HARRINGTON in the vehicle, departed from Main Street and was followed by surveillance units as he turned right onto Charter Oak Avenue and parked just west of the intersection with South Prospect Street in Hartford, CT.   Upon parking, HARRINGTON exited from the rear passenger seat of the CW's vehicle and approached a BMW bearing CT registration 622-YPT, registered to Jahmell HARDING of 157 Henry Street in Windsor, CT, that was parked approximately two car lengths in front of the CW's vehicle.

HARRINGTON returned to the CW's vehicle less than one minute later and handed the CW the

crack cocaine from the back seat.   AUGUSTINE asked the CW if he had the scale ready, which

the CW did.   The CW then asked how much it would cost and HARRINGTON stated "eleven

forty" in reference to $1,140.   The CW counted out the ATF documented funds and then provided

them to HARRINGTON.   Shortly after the transaction was completed, AUGUSTINE and

HARRINGTON exited the CW's vehicle and HARRINGTON was observed walking to the BMW

and entering the passenger side of the vehicle.   AUGUSTINE continued walking towards the

direction of the liquor store.   The CW subsequently returned to the ATF Hartford Field Office and

provided Special Agents with one hundred bags of heroin and a clear plastic bag containing several

smaller clear plastic bags, each of which contained crack cocaine with a total gross weight of

approximately 30.3 grams.

### 3.   Controlled purchase of 29.4 grams of crack cocaine on 11/18/12.

On November 17, 2012, under the direction of the ATF, a CW called Alonzo

HAMILTON and arranged to purchase an ounce of crack cocaine.   On that same date, the CW,

under the direction of the ATF, traveled to the Sheldon Oaks apartment complex and parked in

parking lot located off of Sheldon Street.    Upon his arrival, the CW contacted HAMILTON

who stated that he would be there in several minutes.   Approximately ten minutes later,

HAMILTON arrived operating a blue Honda sedan and parked in the parking lot off of Sheldon

Street.   The CW then pulled his car near HAMILTON's car.   HAMILTON exited his vehicle and

entered the front passenger seat of the CW's vehicle.   As he entered the vehicle, HAMILTON

stated, "Nigga about to pull up with the caine right now".   HAMILTON then asked the CW for a

"calculator", referring to a narcotics scale.   The CW provided HAMILTON with his scale.   At

that time HARRINGTON approached the front passenger door of the CW's vehicle and

HAMILTON provided HARRINGTON with the scale.   HARRINGTON then left area.

Approximately three minutes later, HARRINGTON returned and entered the rear seat of the CW's

vehicle.   HARRINGTON provided the CW with a plastic bag containing several small, white,

rock-like items of suspected crack cocaine.   HARRINGTON introduced himself to the CW as

"Tone".   The CW stated, "I seen you with J.   You was with us before" and HARRINGTON

replied, "Yeah".   The CW then provided HAMILTON with $1,200 in ATF Agent cashier funds

and HAMILTON and HARRINGTON then exited the vehicle.   The CW exited the parking lot

and returned to the ATF Hartford Field Office where he turned over the crack cocaine.   The crack

cocaine was determined to have a total weight, including packaging materials, of approximately

29.4 grams.   After the CW exited the parking lot, HARRINGTON was observed entering a white

Toyota believed to be operated by Michael GLENN.

**4.      Controlled purchase of 29 grams of crack on 12/16/12.**

On December 12, 2012, a CW, under the direction of the ATF, called and texted

AUGUSTINE to arrange to purchase a stack of heroin and an ounce of crack cocaine.   On that

same date, at 1401 hours, AUGUSTINE spoke with HARRINGTON over a cell phone (Target

Telephone 3) used by HARRINGTON.    During this call, AUGUSTINE asked HARRINGTON

for a price for "six trays," which is a common term for 63 grams of cocaine base.   AUGUSTINE

also asked HARRINGTON whether the price for the narcotics is the same as the previous price

that he was paying and HARRINGTON said that he will have to check and let AUGUSTINE

know.

At approximately 1422 hours, HARRINGTON called Michael GLENN to obtain a price

on narcotics.   During this call, GLENN refused to provide the information to HARRINGTON, as

he indicated that he had previously told him in person and did not want to speak on the phone.   At

approximately 1424 hours, HARRINGTON called AUGUSTINE back and said that he could not

get a price.   AUGUSTINE replied that HARRINGTON should get a price for him and that he

(AUGUSTINE) would call him back later.   At approximately 1021 hours, AUGUSTINE called

HARRINGTON and discussed that they would conduct the transaction around 6:00 or 7:00 p.m.

that evening.   At 1027 hours, HARRINGTON contacted GLENN, as his source of supply, and

told him that his "man", AUGUSTINE, called him and that "nigga that we went to go see last

time" (i.e., the CW) is ready to buy narcotics "around six or seven o'clock tonight."

On that same date, the CW sent AUGUSTINE a text and told him he would not be able to

conduct the transaction until Sunday.   On Sunday, December 16, 2012, the CW contacted

AUGUSTINE to arrange the transaction.   At approximately 1540 hours, AUGUSTINE called

HARRINGTON and said that his customer (i.e., the CW) is ready.   AUGUSTINE and

HARRINGTON then discuss a price for the narcotics and HARRINGTON told AUGUSTINE

that, "fourteen…that's the lowest they can get," in reference to $1400 for a quantity (likely an

ounce and a half) of crack cocaine.   Toll records show that HARRINGTON used a second cell

phone (which is referenced as "Target Telephone 4") to place two calls to GLENN.

At approximately 1552 hours, HARRINGTON called AUGUSTINE and said that his

crack source is on his way to pick HARRINGTON up.   HARRINGTON said his source can't do it

for $1300, but that $1375 would work.   At approximately 1720 hours, the CW, under the direction

of the ATF, traveled to the Sheldon Oaks apartment complex and parked in a parking lot off of

Sheldon Street.   At approximately 1742 hours, AUGUSTINE entered the front passenger seat of

the CW's vehicle.   AUGUSTINE provided the CW with a "stack" (100 bags) of heroin in

exchange for $490.

AUGUSTINE then exchanged a series of texts with HARRINGTON.   HARRINGTON

10

said he was on his way.   AUGUSTINE said he only had $1350 (for the quantity of crack cocaine

that AUGUSTINE was purchasing from HARRINGTON) and HARRINGTON was disappointed.

AUGUSTINE then told HARRINGTON to "take a ball off then," meaning to remove an "eight

ball" (i.e., 3.5 grams of crack cocaine) from the agreed-upon quantity of crack cocaine.

  At approximately 1800 hours, a Chevrolet Monte Carlo sedan believed to be operated by

Michael GLENN, pulled up and parked next to the entrance of the Sheldon Street parking lot.

HARRINGTON exited the front passenger seat of the Monte Carlo and walked over and entered

the rear passenger seat of the CW's vehicle.   HARRINGTON then provided the CW with a clear

plastic bag containing 29.4 grams of suspected crack cocaine.   The CW then provided

HARRINGTON with $1200 in ATF funds.   HARRINGTON and AUGUSTINE then exited the

vehicle and walked into the Sheldon Oaks apartment complex.

    **5.**  **Controlled purchase of 29 grams of crack on 12/23/12.**

  On December 21, 2012, a CW, under the direction of the ATF, arranged with

AUGUSTINE to purchase an ounce of crack cocaine on December 23, 2012.   Toll records and

pen data reveal that on the same date, AUGUSTINE had multiple telephone contacts with

HARRINGTON over Target Telephone 4.   (At this time, Target Telephone 4 was not the subject

of Title III interceptions).

  On December 23, 2012, the CW sent a text to AUGUSTINE to arrange the transaction.

Immediately thereafter, AUGUSTINE contacted HARRINGTON over Target Telephone 4.

Thereafter, AUGUSTINE exchanged three text messages with Target Telephone 4 (i.e.,

HARRINGTON).   Target Telephone 4 then placed a call to Michael GLENN cell phone.

Thereafter, AUGUSTINE placed a phone call to HARRINGTON, who then placed a phone call

to Michael GLENN.

On that same date, at approximately 1425 hours, the CW placed a recorded phone call to AUGUSTINE, stating that he wanted to purchase an "ounce" of crack cocaine and AUGUSTINE asked when the CW would be arriving.  The CW stated he could be there in twenty minutes.  AUGUSTINE stated he was going to contact his source and call the CW back to let him know whether or not to start traveling to Hartford.  Pen data reveals that AUGUSTINE then exchanged phone calls and text messages with HARRINGTON.   At 1447 hours, AUGUSTINE told the CW that his crack source would be there in 15 minutes.

On that same date, at approximately 1500 hours, the CW, under the direction of the ATF, traveled to the Sheldon Oaks apartment complex where he arrived at approximately 1512 hours and parked his vehicle in the area in front of 159 Sheldon Street.  At approximately 1528 hours, the CW could be heard through the audio transmitter stating, "Here comes Jay", referring to AUGUSTINE.  Moments later AUGUSTINE was observed by surveillance units as he entered the front passenger seat of the CW's vehicle.  Upon entry into the vehicle AUGUSTINE stated that "Tone" (HARRINGTON) was coming but that he was going to be "a couple minutes".  AUGUSTINE then provided the CW with a plastic bag containing suspected crack cocaine and stated, "that's half.   He gonna bring you the other half".

While in the presence of the CW, at approximately 1536 hours, AUGUSTINE placed a phone call to HARRINGTON, and told him to, "hurry up man".   At approximately 1530 hours, surveillance units observed HARRINGTON exit from 326 Jefferson Street in Hartford in the company of an unidentified female.  Surveillance was maintained as HARRINGTON and the female traveled on foot southbound on Broad Street towards Madison Street.  At approximately 1534 hours, surveillance units observed HARRINGTON and the female enter a taxi on Madison Street and followed the taxi as it brought them to at the Sheldon Oaks housing complex.   At

12

approximately 1540 hours, HARRINGTON and the female exited the taxi.   At approximately 1542 hours, HARRINGTON approached and entered the rear passenger seat of the CW's vehicle. HARRINGTON provided the CW with a plastic bag containing crack cocaine.   The CW then provided HARRINGTON with $1200 in ATF Agent Cashier funds.   At approximately 1545 hours, AUGUSTINE and HARRINGTON exited the CW's vehicle.   At approximately 1546 hours, the CW then exited the area and met with Special Agents of the ATF Hartford Field Office to whom he provided the two plastic bags containing the suspected crack cocaine which was determined to have a total weight of 29.9 grams, including packaging.

B.      **Interceptions over AUGUSTINE's Cell Phone.**

On November 5, 2012, investigators received authorization to intercept wire and electronic communications occurring over a cell phone ("Target Telephone 2") used by AUGUSTINE. Investigators intercepted calls over Target Telephone 2 for approximately eight days until November 12, 2012, when AUGUSTINE was incarcerated for non-payment of child support. During this eight day period, investigators intercepted numerous calls between AUGUSTINE and HARRINGTON during which they discussed and arranged narcotics transactions.   The intercepted calls and other evidence revealed that: HARRINGTON and AUGUSTINE were close associates; HARRINGTON supplied AUGUSTINE with crack cocaine; and HARRINGTON used cellular telephone (860) 794-5233 ("Target Telephone 3") to facilitate his narcotics trafficking activities.

C.      **Interceptions over Target Telephone 3.**

On December 13, 2012, investigators started intercepting wire and electronic communications over a cellular telephone (Target Telephone 3) used by HARRINGTON.   On that same day, HARRINGTON activated a new cellular telephone (i.e., Target Telephone 4).   Within

approximately 7-10 days, HARRINGTON transitioned substantially most of his communications with his narcotics trafficking associates to Target Telephone 4.   While HARRINGTON was still using Target Telephone 3, however, investigators intercepted numerous calls between HARRINGTON and numerous narcotics trafficking associates during which HARRINGTON and his associates discussed and arranged narcotics trafficking activities.

Title III interceptions -- along with consensually recorded meetings and telephone calls, video and audio surveillance, physical surveillance, information from cooperating sources and co-conspirators, and other evidence – revealed the following: on a daily basis, HARRINGTON appeared to be selling narcotics; HARRINGTON obtained crack from Jahmel HARDING, Michael GLENN and others; HARRINGTON was distributing crack to Fabian AUGUSTINE, Alonzo HAMILTON and other drug dealers; HARRINGTON had calls with numerous unidentified individuals during which they discussed and arranged narcotics transactions; HARRINGTON distributed narcotics from a residence at 326 Jefferson Street in Hartford, CT, as well as the Sheldon Oaks apartments in Hartford, CT; HARRINGTON also traveled around Hartford, CT, most frequently with GLENN, to distribute narcotics at various locations; on December 13, 2012, HARRINGTON started to transition his narcotics trafficking activities from Target Telephone 3 to Target Telephone 4; and HARRINGTON started to tell his narcotics trafficking associates that he had a new phone number (i.e., Target Telephone 4) that they should use to contact him.

During wire interceptions, HARRINGTON discussed his problems with his Connecticut state probation office.   For example, on December 14, 2012, HARRINGTON called an unidentified female and discussed missing probation appointments and buying fake urine samples. During this call, HARRINGTON said, "bad thing, cause I was trying to hurry up and be done with

this shit but I've been going through this bullshit lately and when I came back from Florida I knew my piss was going to be dirty.   So I ain't go, and that was probably like my second time missing or whatever and you only supposed to miss three or some shit.   So that was my second time missing and the week after that fucking, I couldn't, I couldn't piss to clean my shit, so I ain't go.   And then after that third time and then last Friday, I ain't go cuz fucking I had to move the shit up out the apartment and all that bullshit, so I ain't fucking go.   So I already told my PO that I couldn't go, but I should be straight like they ain't going to violate me or nothing, I don't think, but it just fuck me up because now I gotta start the program all over again.   But at least I can do it now where I can fucking buy the fake piss and shit.   When I give them a piss, I'll be clean.   And I just gotta give them two more clean ones and then I'll be straight. You follow?"

### D. Interceptions over Target Telephone 4.

On January 10, 2013, investigators received authorization to intercept wire and electronic communications occurring over a second cellular telephone ("Target Telephone 4") used by HARRINGTON.   Investigators intercepted calls over Target Telephone 4 between January 10, 2013 and February 9, 2013.   Intercepted calls, along with other evidence, revealed the following: HARRINGTON spent the majority of his time in Providence, Rhode Island; HARRINGTON became deeply involved in the Providence drug trade, using Target Telephone 4 to conduct his drug trafficking activities; on a regular basis, HARRINGTON made telephone calls and text messages to coordinate the drug transactions; during intercepted calls, HARRINGTON indicated an intent to possibly remain in Providence on a long-term basis; HARRINGTON continued to obtain crack cocaine from Connecticut sources, including Jahmell HARDING, Michael GLENN, Morgan GILL and Luther NANCE; HARRINGTON distributed narcotics to numerous customers, many of whom remained unidentified; and HARRINGTON had multiple discussions with

15

Connecticut-associates about them purchasing a long gun.

As noted, while HARRINGTON was in Providence, RI, he continued to get crack from Connecticut sources of supply.   For example, on January 17, 2013, HARDING sent a text message to HARRINGTON which read, "I got 6 tra on deck 12500 snap," in reference to providing a "six tray" (63 grams) of crack cocaine for $12,500.   Shortly thereafter, HARRINGTON called Michael GLENN and told him that his "Spanish boy" with the BMW (HARDING) had crack for "$12,500."   HARRINGTON and GLENN discussed obtaining crack from HARDING, GLENN and other sources, and the favorable market for selling crack in Providence, RI.   Thereafter, investigators intercepted calls with GLENN, GILL and others during which HARRINGTON discussed going back to Connecticut to re-up his crack supply.

As also noted above, HARRINGTON had multiple discussions with his Connecticut-based associates about purchasing a long gun.   HARRINGTON had discussions with, among others, GLENN, GILL, HAMILTON and ARMOUR about HARRINGTON's "peoples" or "boy" having a gun that he was looking to sell because his boy didn't want to get caught with it.

### E.   Post-Arrest Admissions of HARRINGTON.

On June 13, 2013, investigators arrested HARRINGTON pursuant to a federal arrest warrant.   At the time of his arrest, HARRINGTON was cooperative and consented to a search of his bedroom.   After waiving his *Miranda* rights, HARRINGTON provided a written statement regarding his narcotics trafficking over the past several years.

In his written statement, HARRINGTON said, among other things, that for the time period February 2006 until September 2012, he sold, on average, approximately ½ ounce of crack cocaine per week, except when he was in jail in 2007.   HARRINGTON said that from September 2012 until February 2013, he sold approximately 1 ½ ounces of crack cocaine per week.

16

HARRINGTON said that his crack sales were mostly in Hartford, CT, but he also sold crack in Providence, RI.   HARRINGTON said that Michael GLENN was his primary source of supply of crack cocaine from January 2008 until September 2012, but HARRINGTON also obtained crack cocaine from other sources.   HARRINGTON said that he would obtain about ¼ ounce of crack cocaine per week from Michael GLENN and resell it for profit.   From September 2012 until February 2013, HARRINGTON purchased his crack cocaine from Luther NANCE, Morgan GILL and Michael GLENN.   HARRINGTON said he also purchased crack cocaine from others, including from Antoine ARMOUR in the Summer of 2012.   HARRINGTON said he resold the crack for profit.   HARRINGTON said he does not use crack, but he does smoke marijuana. HARRINGTON said he would make arrangements to buy and sell crack over the telephone and by text messages.   In his statement, HARRINGTON further said that since February 2013, he realized that he had to change his ways, when he had his daughter.   HARRINGTON said that since that time, he has not been selling crack cocaine, but has been working different jobs to make money.

In addition to his signed, written statement, HARRINGTON also made verbal statements to investigators.   HARRINGTON admitted, among other things, that he met an individual in Providence, RI, who asked HARRINGTON to find a buyer for an assault rifle.   HARRINGTON said he never found a purchase for the assault rifle and does not know what became of the rifle.

**** 

In sum, the evidence establishes that the defendant Anthony HARRINGTON conspired with numerous individuals, including Fabian AUGUSTINE, Alonzo HAMILTON, Michael GLENN, Jahmell HARDING, Morgan GILL, Antoine ARMOUR, Luther NANCE and others to possess with intent to distribute and to distribute cocaine base.   In addition, the evidence

establishes that the defendant's relevant and reasonably foreseeable offense conduct involved more than 112 grams, but less than 196 grams, of cocaine base.

## III.   THE DEFENDANT'S GUIDELINE RANGE

The government and the defendant agree with the Guideline calculation set forth in the PSR.   See Def. Mem. at 4-5.   Specifically, the defendant's relevant and reasonably foreseeable offense conduct involved at least 112 grams, but less than 196 grams, of cocaine base, which yields a base offense level of 28.   See PSR ¶ 28.   After a three level reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility, the defendant's adjusted offense level is 25.   See PSR ¶ 37.   An adjusted offense level of 25 and a Criminal History Category IV results in a Guideline range of 84 to 105 months of imprisonment, a fine range of $10,00 to $5,000,000 and a supervised release term of 4 years to life. See PSR ¶¶ 77, 85.

However, consistent with the recent proposed amendments to the Sentencing Guidelines, the Government would agree to a 2-level downward variance to this Guideline range.   A 2-level downward variance would place the defendant at a total offense level of 23.   A total offense level of 23, again assuming a Criminal History Category IV, would result in a Guideline imprisonment range of 70 to 81 months' imprisonment, a Guideline fine range of $10,000-$5,000,000 (U.S.S.G. § 5E1.2(c)(4)) and a supervised release term of 4 years to life.

## IV.   A SENTENCE AT WITHIN THE DEFENDANT'S
## GUIDELINE IMPRISONMENT RANGE IS APPROPRIATE

The Government respectfully submits that the Court should impose a sentence within the defendant's guideline range, which is 70 to 81 months' imprisonment, for several principal reasons.   First, such a sentence should be imposed to reflect the seriousness of the defendant's offense conduct.   On a regular basis over a series of years, HARRINGTON sold crack cocaine for

profit.   HARRINGTON obtained crack cocaine from numerous sources of supply, including

GLENN, HARDING, GILL, NANCE and others.   HARRINGTON sold crack cocaine to

AUGUSTINE, HAMILTON and other customers in Hartford, CT and Providence, RI.   As

HARRINGTON admitted in his post-arrest statement, HARRINGTON sold crack cocaine to

make money.   This is serious criminal conduct.   While drug trafficking is sometimes

characterized as a victimless crime, trafficking dangerous narcotics like crack cocaine has had a

devastating impact on far too many communities in Connecticut and elsewhere.

The defendant argues in his sentencing memorandum that his drug addiction led to his

criminal activity and that the central issue facing the Court is balancing the seriousness of the

crime and HARRINGTON's criminal history with the drug addiction that HARRINGTON has

struggled with for many years.   See Def. Mem. at 6.   According to the PSR, HARRINGTON has

a "substance abuse history that includes alcohol, marijuana, crack cocaine, PCP and Ecstasy."

See PSR ¶ 64.   The Government agrees that the Court will need to weigh the seriousness of

HARRINGTON's offense conduct and his criminal history, along with his substance abuse history

and other 18 U.S.C. § 3553(a) factors, and that HARRINGTON's substance abuse history likely

contributed to his poor decision making.   It bears mentioning, however, that HARRINGTON, in

his post-arrest written statement, said that "the crack cocaine I purchased . . . I sold to others for a

profit.   I do not use crack cocaine myself but do smoke marijuana."

In sum, a sentence to a significant term of imprisonment is necessary to reflect the

seriousness of the defendant's criminal activities, as well as to promote respect for the law and to

provide just punishment for the offense.   See 18 U.S.C. § 3553(a)(2)(A).

Second, HARRINGTON's history and characteristics, including his criminal history, supports a significant sentence of imprisonment. HARRINGTON has five felony convictions in Connecticut Superior Court for Possession of Narcotics (PSR ¶ 48), Conspiracy to Sell Narcotics (PSR ¶ 47), Possession of Narcotics (PSR ¶ 46), Failure to Appears 1st Degree (PSR ¶ 45) and Possession of Narcotics (PSR ¶41).   HARRINGTON also has a misdemeanor conviction in Connecticut Superior Court for Larceny 6th (PSR ¶ 40).   In addition, HARRINGTON has convictions in Rhode Island Superior Court for Assault and Resisting Arrest (PSR ¶ 42), Manufacturing/Delivering/Possessing with Intent to Distribute Controlled Substances (PSR ¶ 43) and Manufacturing/ Possessing/Delivering Controlled Substances (PSR ¶ 44).   Further, the defendant was on state probation and was being supervised by the State of Connecticut Office of Adult Probation while he was committing the instant offense.   Moreover, as discussed above, investigators intercepted a call where HARRINGTON discussed missing probation appointments to provide urine samples and his plan to buy fake urine.[1]

Third, a sentence of imprisonment within the defendant's guideline range would appropriately protect the public from the defendant, see 18 U.S.C. § 3553(a)(2)(C), and provide adequate deterrence to future criminal conduct of the defendant and others.   See 18 U.S.C.

---

[1]      According to the PSR, when asked why the Court should believe that he has turned a corner and will not again return to criminal conduct, HARRINGTON said that he previously did not have children.   See PSR ¶23.   HARRINGTON further said that he "made a New Year's resolution" and indicated that he discontinued his participation in the conspiracy prior to his arrests.   See id.   It bears mentioning that HARRINGTON continued to distribute crack cocaine after his first child was born.   (It is not apparent from the PSR when HARRINGTON's second child was born).   Further, as discussed above, HARRINGTON continued to traffick crack cocaine during the period that investigators intercepted calls over Target Telephone 4 (i.e., January 10, 2013 through February 9, 2013).   Thereafter, investigators arrested NANCE and certain co-conspirators in Connecticut and focused their narcotics investigation on individuals who were sending wholesale quantities of cocaine from California to Connecticut; as a result, investigators do not know whether HARRINGTON (or other co-conspirators in Connecticut who were not then arrested) continued to deal crack cocaine after February, 2013.

§ 3553(a)(2)(B).   A definitive and clear message must be sent that the Court will not tolerate regularly selling crack cocaine for profit, particularly by someone who has been convicted of *six* prior felony convictions for narcotics related offenses.   A significant sentence of imprisonment would send an appropriate and necessary message not only to the defendant, but also to others in the community, that this activity will not be tolerated by this Court.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, the Government submits that a sentence within the defendant's guidelines range is reasonable, appropriate and not greater than necessary to achieve the purposes of sentencing under 18 U.S.C. §3553(a).

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

*/s/ Geoffrey M. Stone*

GEOFFREY M. STONE
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. CT 25326

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on July 8, 2014, a copy of the foregoing Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.   Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.   Parties may access this filing through the Court's CM/ECF System.

*/s/ Geoffrey M. Stone*
_____

GEOFFREY M. STONE
ASSISTANT UNITED STATES ATTORNEY